```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
                      EASTERN DIVISION
```

FILED
JAN 1 3 2015
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) No. | **4:15CR008 RLW** |
| ) | |
| LAWRENCE B. IKEN, DPM ) | |
| and ) | |
| LAWRENCE B. IKEN, DPM, LLC, ) | |
| ) | |
| Defendants. ) | |

## INFORMATION

The United States charges that:

### INTRODUCTION

1. At all times relevant to this information, defendant Lawrence B. Iken, DPM, was licensed by the state of Missouri as a doctor of podiatry. He was first licensed in June 1973.

2. At all times relevant to this information, defendant Lawrence B. Iken, DPM, LLC was a Missouri limited liability company, which was incorporated in 1999. Defendant Iken is the president. The defendants have offices at 14615 Manchester Road, Suite 101, Manchester, MO 63011 and 675 Old Ballas Road, Suite 250, Creve Coeur, MO 63141.

3. At all times relevant to this information, defendant Iken was a sole practitioner who provided podiatry services to patients at his Manchester and Creve Coeur offices and at various nursing homes in the St. Louis area.

4. In addition to his office practice, defendant Iken is an independent contractor for Preferred Podiatry Group, Inc. (PPG). According to its website, PPG provides podiatric care to residents in nursing homes and other long term care facilities in Missouri and five other states.

As a PPG contractor, defendant Iken provided services to nursing home residents on Wednesdays and Thursdays.

## Relevant Medicare
## Regulatory and Administrative Provisions

### General Medicare Provisions

5. Medicare is a federal health insurance program for individuals age 65 and older and for certain categories of disabled people. The Centers for Medicare and Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS) administers the Medicare Program. The Secretary of HHS has broad statutory authority to prescribe such regulations as may be necessary to carry out the administration of the Medicare Program. 42 U.S.C. §1395hh(a)(1).

6. In addition to promulgating regulations, the Secretary has the power to formulate rules for the administration of the Medicare Program, through the issuance of manual instructions, interpretative rules, statements of policy, and guidelines of general applicability. 42 U.S.C. §1395hh(c)(1). Under this power, the Secretary of HHS formulated the Medicare Manual. HHS requires that providers comply with the Medicare Manual, as well as Medicare statutes and regulations, when submitting reimbursement claims for services.

7. CMS selects and contracts with private companies to act as its agents in administering the Medicare Program, and these companies are responsible for receiving, reviewing, and paying claims for services provided to Medicare beneficiaries. These private companies are called Medicare administrative contractors (MACs). The MACs are responsible for processing claims arising within their assigned geographic areas, including determining whether the claim is for a covered service. At all times relevant to this indictment, Wisconsin Physicians Services (WPS) was the MAC for the state of Missouri.

8. To receive Medicare reimbursement for services to Medicare beneficiaries, providers must make written application to the MAC and execute a written provider agreement. Providers agree that they will comply with all applicable Medicare statutes, regulations and guidelines.

9. As part of the application process, on or about October 17, 2000, defendant Iken signed a CMS-8551 form that informed him of the penalties for falsifying information to gain or maintain enrollment in the Medicare program, as well as penalties for falsifying information when seeking reimbursement from the Medicare program.

10. On or about October 17, 2000, March 26, 2001 and again on March 23, 2009, defendant Iken signed a certification statement, entitled "Penalties for Falsifying Information," which stated in part:

> I am aware that falsifying information will result in fines and/or imprisonment. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by the Medicare or other federal health care programs, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

11. To obtain reimbursement for services rendered, the provider must submit a paper or electronic claim form and certify that the information on the claim form is accurate, including the identity of the patient, the provider number, the service provided, and the medical necessity for the service rendered. Because of the large number of claims received by Medicare, MACs generally rely on and pay claims based on the information on the Medicare claim forms and the providers' certifications.

12. However, Medicare requires that the provider document in the patient's medical record the services that were provided and that the services were reasonable and necessary.

3

"Medicare Benefit Policy Manual," Chapter 15, Section 290. If requested, the provider must produce the documents reflecting the patient's conditions, diagnoses, and treatment.

13.     Medicare providers must retain clinical records for the period required by state law or five years from the date of discharge if there is no requirement in state law. Missouri statutes require that physicians maintain patient records for a minimum of seven years from the date when the last professional services were provided. Thus, Missouri mandates that the defendants must maintain all patient records for services they provided from August 2007 to the present.

### General Medicaid Provisions

14.     Title XIX of the Social Security Act established the Grants to States for Medical Assistance Programs, popularly known as the Medicaid Program. The Medicaid Program is a federal and state-funded health insurance program administered by the various states. The State of Missouri administers its Medicaid Program through the Department of Social Services, Missouri HealthNet Division (Missouri Medicaid). Missouri Medicaid reimburses health care providers for covered services rendered to low-income Medicaid recipients.

15.     In order to be reimbursed by Medicaid, a person or entity rendering a medical service to Medicaid beneficiaries must enter into a "provider agreement" with Missouri Medicaid. Providers agree that they will comply with all applicable Medicaid statutes, regulations and guidelines.

16.     A Medicaid provider must submit claims by completing a CMS 1500 form, which contains the following certification:

> . . . [T]he services listed above were medically indicated and necessary to the
> health of this patient and were personally furnished by me or by my employee
> under my personal direction . . . and the foregoing information is true, accurate
> and complete. I understand that payment and satisfaction of this claim will come

4

from federal and state funds, and that any false statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws.

17. When a provider renders services to a person who is both a Medicare beneficiary and a Medicaid beneficiary, the provider submits the claim to Medicare only. If the claim is acceptable to Medicare, Medicare pays 80% of the allowable charge and sends the claim to Medicaid for payment of 20% of the allowable charge. This latter payment is sometimes called a crossover claim or payment. Missouri Medicaid relies on the review by Medicare of the claim and generally does not independently review the claim prior to payment.

18. Providers must retain for five years from the date of service medical records that fully document services billed to Medicaid and must furnish or make the records available upon request for inspection and audit by Medicaid. Failure to furnish, reveal, or retain adequate documentation for services may result in recovery of the payments for those services not adequately documented.

## CPT Procedure and Codes

19. Health care providers utilize numerical codes, called CPT codes, on their claim forms to identify the services provided to the patient. CPT codes or "Current Procedural Terminology" codes are a uniform way of accurately describing medical, surgical, and diagnostic services provided to patients. The CPT code consists of a number and descriptive terms. Physicians are required to include the appropriate CPT codes when billing for services provided to Medicare and Medicaid beneficiaries.

20. Several CPT codes are used to describe the incision and drainage of an abscess, which is an accumulation of fluid, usually pus or blood, in any part of the body that, in most cases, results in swelling and inflammation around it. Incision and drainage is the cutting of a

5

wound to allow for the flow or withdrawal of fluids from the abscess.

      a.    CPT code 10060 is used to describe the incision and drainage of a simple or single abscess.

      b.    CPT code 10061 is used to describe the incision and drainage of complicated or multiple abscesses.

21.    CPT code 10140 is used to describe an incision and drainage of a hematoma, which is a localized swelling that is filled with blood from a break in the wall of a blood vessel.

22.    At all times relevant to this indictment, the defendants received about $128.00 for the incision and drainage of a hematoma and about $91.00 for the incision and drainage of an abscess. The defendants would have received substantially less, about $8.00, for simply trimming the toenails of persons with systemic diseases and would have received nothing for trimming normal toenails, in the absence of disease.

## COUNT 1
## HEALTH CARE FRAUD SCHEME
## 18 U.S.C. 1347(a)(1) and 2

### DESCRIPTION OF THE FRAUD SCHEME

23.    At all times relevant to this information, the defendants routinely used "Patient Charge Slips," (referred to hereafter as charge slips), to record the podiatric service that defendant Iken purportedly provided to each patient. The charge sheet was a checklist that contained a brief description of each service or procedure and the CPT code that described the service or procedure. Defendant Iken checked the box on the charge slip to indicate what service he provided and what was to be billed. If the service was not listed on the charge slip, defendant Iken hand wrote the CPT code on the charge slip.

24.    After completing a charge slip, defendant Iken gave the charge slip to his office

staff working at the front desk. Thereafter, the front desk staff entered the billing data directly from the charge slip into the computer, which transmitted the billing data to Medicare, Medicaid, and other payers.

25. It was part of the scheme and artifice to defraud that defendant Iken routinely falsely stated on the charge sheet and in the patient files that he had provided a service or performed a procedure when he knew he had not performed the service or procedure.

26. It was further part of the scheme and artifice to defraud that defendant Iken routinely "up-coded" the services that he provided, that is, he billed, or caused others, to bill for services that paid more than the services that he actually provided. The up-coded services include, but are not limited to, the incision and drainage of abscesses and hematomas, when defendant Iken only trimmed toenails.

### Undercover Investigation

27. From on or about August 30, 2013 to on or about May 9, 2014, HHS special agents conducted an undercover investigation of the defendants. With the consent of patient representatives, on four separate occasions, the agents observed and videotaped or audiotaped defendant Iken while he was providing services to three separate patients. In each instance, defendant Iken only trimmed the patients' toenails. He never incised, that is, pierced or cut the skin of the patients' toes; nor did he drain blood or any other fluid from the patients' toes. Nonetheless, defendant Iken recorded on their charge slips that he had performed an incision and drainage of an abscess or a hematoma.

28. The three patients, who were videotaped at defendant Iken's office, were disabled and resided at Emmaus Homes. Employees of Emmaus Homes drove the patients to defendant Iken's office and remained with them throughout the office visit. The patients are further

7

described in the following paragraphs.

**Patient L.L.**

29. Patient L.L. has been a patient of defendant Iken for the past seven years and received services from him approximately every two months. On August 30, 2013, defendant Iken spent approximately three minutes with patient L.L., during which time he used a clipper to trim patient L.L's toenails, filed the nails with an electric nail file, and placed a Band-Aid on the right big toe. On patient L.L.'s charge slip, defendant Iken checked the box "Incision & Drainage of Abs, 10060."

30. On November 1, 2013, patient L.L. returned to defendant Iken's office for her bi-monthly visit. Defendant Iken spent approximately two minutes with patient L.L. and used a clipper to trim patient L.L.'s toenails. On patient L.L.'s charge slip, defendant Iken wrote "10140," which is the CPT code for incision and drainage of a hematoma.

31. On January 3, 2014, patient L.L. visited defendant Iken's office. Defendant Iken spent one minute and six seconds treating patient L.L. He first used a clipper to trim patient L.L's toenails and then filed the nails with an electric nail file. On patient L.L.'s charge slip, defendant Iken checked the box "Incision & Drainage of Abs, 10060."

32. On May 9, 2014, patient L.L. visited defendant Iken's office. Defendant Iken spent about one minute and forty-two seconds treating patient L.L. He first used a clipper and another tool to trim and file patient L.L.'s toenails and also applied what appeared to be Neosporin and a Band-aid on one of the toes. On patient L.L.'s charge slip, defendant Iken wrote "10140," which is the CPT code for incision and drainage of a hematoma.

**Patient C.D.**

33. Patient C.D. has also visited defendant Iken's office approximately every two

months for the past seven years. On August 30, 2013, defendant Iken spent less than one minute (approximately fifty-four seconds) treating patient C.D. The defendant used a clipper to trim patient C.D.'s toenails. On patient C.D.'s charge slip, defendant Iken checked the box "Incision & Drainage of Abs, 10060."

34. On November 1, 2013, patient C.D. returned to defendant Iken's office. Defendant Iken spent approximately one minute and eight minutes treating patient C.D. The defendant used a clipper to trim patient C.D.'s toenails. On patient C.D.'s charge slip, defendant Iken checked the "Incision & Drainage of Abs, 10060" box.

35. On January 3, 2014, patient C.D. visited defendant Iken's office. The defendant spent less than one minute (approximately forty-three seconds) treating C.D. The defendant trimmed patient C.D.'s toenails with a clipper. On patient C.D.'s charge slip, defendant Iken checked the "Incision & Drainage of Abs, 10060" box.

36. On May 9, 2014, patient C.D. visited defendant Iken's office. The defendant spent about one minute and eight seconds treating C.D. The defendant trimmed patient C.D.'s toenails with a clipper. On patient C.D.'s charge slip, defendant Iken wrote "11061," which is the CPT code for incision & drainage of complicated or multiple abscesses.

**Patient J.C.**

37. Patient J.C. has visited defendant Iken's office approximately every two months for the past two and a half years. On August 30, 2013, defendant Iken spent approximately two minutes and six seconds treating patient J.C. The defendant trimmed J.C.'s toenails with a clipper and filed the nails, using an electric nail file. On patient J.C.'s charge slip, defendant Iken wrote "10140," which is the CPT code for incision and drainage of a hematoma.

38. On November 1, 2013, patient J.C. returned to defendant Iken's office.

9

Defendant Iken spent approximately one minute treating J.C. The defendant used a clipper to trim patient J.C.'s toenails. On patient J.C.'s charge slip, defendant Iken wrote "10140," which is the CPT code for incision and drainage of a hematoma.

39. On January 3, 2014, patient J.C. again visited the defendant's office. Defendant Iken spent less than two minutes treating J.C. The defendant trimmed patient J.C.'s toenails with a clipper and filed patient J.C.'s toenails, using an electric nail file. On patient J.C.'s charge slip, defendant Iken wrote "10140," which is the CPT code for incision and drainage of a hematoma.

40. On May 9, 2014, patient J.C. again visited the defendant's office. Defendant Iken spent about one minute and six seconds treating J.C. The defendant trimmed patient J.C.'s toenails with a clipper. On patient J.C.'s charge slip, defendant Iken wrote "10140," which is the CPT code for incision and drainage of a hematoma.

## SUBMISSION OF FALSE STATEMENTS

41. At times relevant to this indictment, the defendant submitted false statements to WPS, a Medicare contractor, in response to a post payment review. As an example, on April 14, 2011, patient R.K. made a hotline complaint, stating that he or she did not receive the services for which Medicare was billed. Patient R.K. stated that defendant Iken billed Medicare for an "Incision and Drainage of an abscess," CPT code 10060, on three separate visits (December 14, 2010; February 3, 2011; and March 17, 2011), when defendant Iken had only trimmed his toenails.

42. On June 7, 2011, WPS sent a letter to defendant Iken and requested that he submit the face sheet, admissions form, copy of Medicare card, and treatment notes for the three visits. On June 10, 2013, defendant Iken sent a signed letter to WPS in response to the inquiry. He falsely stated that he initially saw patient R.K for a painful ingrown toenail on October 14,

2010, and performed a "minor incision and drainage (I&D) on the medial borders, hallux nail, bilateral." Defendant Iken further falsely stated that "a minor incision and drainage procedure was performed on the medial border, hallux nails, bilateral sterile dressings were applied on each [subsequent] visit."

43.     Further, defendant Iken sent WPS handwritten treatment notes for the three visits; the notes fit on approximately one-half of a page. Relying on the false information provided by defendant Iken, WPS found that the medical records supported the services billed to Medicare.

### Execution of the Health Care Fraud Scheme

44.     On or about January 17, 2014, in the Eastern District of Missouri, the defendants herein,

**LAWRENCE B. IKEN, DPM**
**and**
**LAWRENCE B. IKEN, DPM, LLC,**

knowingly and willfully executed, and attempted to execute, the above described scheme or artifice to defraud a health care benefit program, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted a reimbursement claim to the Medicare Program, a health care benefit program, which claim falsely represented that Dr. Iken performed an incision and drainage of an abscess on Patient C.D.

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

### FORFEITURE ALLEGATIONS

The United States Attorney further finds by probable cause that:

1.     Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Section 1347 as set forth in Count 1, the defendants shall forfeit to the United States of America any property, real or personal, that

constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

    2.    Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

    3.    If any of the property described above, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

    Respectfully submitted,

    RICHARD G. CALLAHAN
    United States Attorney


    *Dorothy L. McMurtry*
    DOROTHY L. McMURTRY, #37727MO
    Assistant United States Attorney
    111 South 10th Street, Room 20.333
    St. Louis, Missouri  63102
    (314) 539-2200

UNITED STATES OF AMERICA )
EASTERN DIVISION )
EASTERN DISTRICT OF MISSOURI )

I, Dorothy L. McMurtry, Assistant United States Attorney for the Eastern District of Missouri, being duly sworn, do say that the foregoing information is true as I verily believe.

*Dorothy L. McMurtry*
DOROTHY L. McMURTRY, #37727MO

Subscribed and sworn to before me this 5th day of December, 2014

*Gregory J. Linhares*
CLERK, U.S. DISTRICT COURT

By: *Nicole Rode*
DEPUTY CLERK